UNITED STATES of America, Plaintiff,

v.

GENCORP, INC., et al., Defendants and Third–Party Plaintiffs,

v.

DETREX CORPORATION, et al., Third–Party Defendants.

No. 5:89 CV 1866.

United States District Court, N.D. Ohio, Eastern Division.

June 21, 1996.

Leonard M. Gelman, Steve J. Willey, Michael Rowe, David Zugschwerdt, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, for plaintiff.

Ralph E. Cascarilla, Walter & Haverfield, Cleveland, Ohio, Joseph D. Lonardo, Vorys Sater Seymour & Pease, Columbus, OH, for Proponent Parties.

Luis Berrones, Richard J. Kissel, Gardner, Carton & Douglas, Chicago, IL, for Archer Daniels Midland.

## MEMORANDUM OPINION

DOWD, District Judge.

### I. INTRODUCTION [1]

This complex Superfund litigation has been proceeding under the supervision of Magistrate Judge David S. Perelman, who has prepared a Report and Recommendation ("R & R") (Docket No. 597) recommending that the Court enter an order which would approve settlements and dismiss claims between and among more than two dozen parties in this case. Objections to the R & R have been filed by a single third-party defendant Archer–Daniels–Midland Co. ("ADM") (Docket No. 608). Several parties responded to the objections (Docket Nos. 609, 611 and 612), and ADM filed a reply brief (Docket No. 614).[2] The Court has engaged in a *de novo* review of the portions of the R & R to which ADM objected. Upon careful consideration, the Court adopts Magistrate Judge Perelman's recommendation and will enter the proposed order.

### II. BACKGROUND FACTS [3]

The United States originated this complaint on behalf of the Environmental Protection Agency ("EPA") under Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9607, in 1989 to recover costs incurred in responding to releases or threatened releases of hazardous substances at a site in Ashtabula, Ohio, known as the Fields Brook Site. In response to the complaint, the defendants filed answers denying liability and asserting various counterclaims against the United States[4] and crossclaims against one another. Defendants also asserted third-party claims against numerous additional parties, including claims under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), seeking indemnification and contribution for all costs incurred or to be incurred by defendants in connection with the site. In turn, several third-party defendants asserted contribution claims against third-party plaintiffs.

The United States' complaint sought reimbursement of costs incurred in conducting a remedial investigation and feasibility study of the Fields Brook site. In 1992, Judge White entered a consent decree that provided for reimbursement of $1,250,000 of the response costs incurred by the United States in connection with the site through 1989. The decree reserved the rights of the United States to assert future claims against all defendants for all other matters including, *inter alia*, claims for recovery of costs incurred after 1989 and claims to require response actions at the site.

Following entry of the consent decree, the focus of the litigation shifted to issues relating to apportionment of responsibility among the defendants and third-party defendants for what will be a massive cleanup.[5] Many

1. This case was transferred to the docket of the undersigned from the docket of Chief Judge George W. White on April 1, 1996.

2. The Federal Rules of Civil Procedure do not contemplate the filing of a reply brief in the process of a district court considering a Report and Recommendation. *See* Fed.R.Civ.P. 72. However, in an abundance of caution, the Court has considered the arguments in ADM's reply brief.

3. Having entered this case some seven years after its genesis, the Court solicited the assistance of all parties in educating itself about the controversy. Upon receiving the case, the Court issued an order directing counsel for all parties to file reports summarizing the status of the case from the perspectives of their clients (Docket No. 582). The Court received thirteen status reports, some of which were submitted jointly by multiple parties. While the R & R was pending, the Court invited the parties to attend a status conference to discuss informally the respective positions on the R & R. With the benefit of the parties' input, both in person and in the briefs, the Court now proceeds with the complex issues involved.

4. The counterclaims against the United States arise from the alleged activities of federal entities in connection with past ownership or operation of facilities in the Fields Brook area.

5. The potentially responsible parties face liability which could exceed $100 million before cleanup is complete. *See* Status Report of Proponent Parties, Docket 603, at 3–4. Phase I of the cleanup primarily involves investigative and design expenses and is estimated to cost $24 million. Phase II is the remediation stage and is estimated to cost between $60 million and $107

of the potentially responsible parties formed the Fields Brook Potentially Responsible Party Organization ("FBPRPO") which engaged in a voluntary non-binding arbitration process to determine each company's fair share of responsibility for the Phase I costs at the site, an allocation which is providing a basis for Phase II settlements as well. This comprehensive process resulted in a proposed allocation formula for division of responsibility among the parties, including parties choosing not to participate in the arbitration process. All parties in the FBPRPO chose to accept the arbitrator's final recommended allocation.

After acceptance of the allocation recommendation, most of the parties participating in the arbitration process agreed to form the Fields Brook Remedial Action Group ("FBRAG"). This group, consisting of fourteen parties,[6] is responsible for performing Phase II remedial activities at the site. It also has been negotiating with parties to this lawsuit which are not members of the FBRAG but which seek to resolve their liability to FBRAG members for Phase I and Phase II costs. The FBRAG provided nonparticipants in the arbitration process with a statement proposing the amount of their liability and a detailed explanation of the arbitrator's rationale for determining their liability. To date, thirteen parties have agreed to

settle their claims with the FBRAG based upon the arbitrator's proposal.[7]

For purposes of the proposed order and settlement agreements, parties comprising the FBRAG are identified as the "proponent parties" because they have proposed the order which this Court is being asked to approve. Parties which have settled with FBRAG are identified as "settling parties." Parties which neither comprise the FBRAG nor have settled with the FBRAG are identified as "non-settling parties."[8]

The order which the Court is being asked to enter provides the following:

1. The settlement agreements by and among the proponent parties and the settling parties are fair, reasonable and satisfy the requirements of CERCLA, and are hereby approved.

2. The Uniform Comparative Fault Act, Section 6, 12 U.L.A. 42, applies to determine the effect of the settlement agreements, except as to present and future claims of the United States as plaintiff.

3. All claims against the settling parties for "covered matters" as defined by the settlement agreements are barred, except as to present and future claims of the United States as plaintiff.

4. All claims, third-party claims, cross-claims and counterclaims by any party

million, exclusive of site-specific source control remedial activities.

6. The parties are GenCorp Inc., Olin Corporation, SCM Chemicals, The Sherwin–Williams Company, Union Carbide Corporation, Cabot Corporation, Ohio Power Co., Centerior Energy Corporation, Detrex Corporation, Viacom International, RMI Titanium Company, United States Steel Corp., Occidental Chemical Corporation and Quantum Chemical Corp. (formerly known as National Distillers & Chemical Corp., a division of Mallory Sharon Metals).

7. These parties are ASHTA Chemicals, Brenkus Excavating, Inc. (now known as B.J. Excavating Inc.), C.H. Heist Corporation, Elkem Metals Corporation, ESAB Welding Products Inc., Greenleaf Motor Express Inc., Koski Construction Co., Mallinckrodt Group Inc., Motta's Body & Frame Shop, Inc., Plasticolors, Inc., Precon Manufacturing Co., Reserve Environmental Services and Stauffer Chemical Co. (now known as Rhone–Poulenc Inc.).

The Hanlin Group, Inc. ("Hanlin") is listed on a flow chart provided to this Court as a "settling party" but is not a party to the order this Court is being asked to enter. The docket reflects proceedings were stayed against Hanlin in 1993 upon Hanlin's declaration of bankruptcy (Docket No. 422). Counsel for the FBRAG represent to this Court that the FBRAG and Hanlin have filed a stipulation of dismissal with the Court. However, the docket reflects no such stipulation being filed. Upon receipt of such stipulation, the Court will consider dismissing Hanlin.

8. According to information provided to the Court on May 30, non-settling parties include ADM, Conrail, Inc., Delta Associates (also known as Acme Scrap Iron), Luntz Corp., Northcoast Auto Crushing, the United States, Vygen (which is in bankruptcy), and Westinghouse Environmental Management Company of Ohio. The proponent parties have represented to this court that negotiations continue with several of these parties and more settlements are expected.

against the settling parties are dismissed without prejudice.

5. All claims, third-party claims, cross-claims and counterclaims by the settling parties against the proponent parties are dismissed without prejudice.

6. All claims, third-party claims, cross-claims and counterclaims among and between the settling parties are dismissed without prejudice.

7. The settling parties assign their claims and actions to the proponent parties pursuant to the settlement agreements. However, pursuant to the UCFA, the proponent parties and the settling parties are barred from pursuing or recovering on the assigned claims against any non-settling party.[9]

8. Claims, third-party claims, cross-claims and counterclaims by the proponent parties against the non-settling parties remain pending for adjudication.

9. Conversely, claims, third-party claims, cross-claims and counterclaims against the proponent parties by the non-settling parties remain pending for adjudication.

10. Nothing in the order or the settlement agreements is intended to decide whether the proponent parties may be required to disclose the amounts paid under the settlement agreements at a later time in this case.

Also relevant to the Court's consideration is a clause in the "Whereas" portion of the order stating,

WHEREAS, the United States contends that the Uniform Contribution Among Joint Tortfeasors Act ("UCATA") applies to determine the effect of the Settlement Agreements on the United States' present and future claims as Plaintiff at this Site. For purposes of the instant Settlement Agreements, the Court need not decide this issue and specifically reserves its ruling.

## III. DISCUSSION

ADM advances two primary objections to the Report & Recommendation. First, it argues that the proposed order leaves ADM at risk for disproportionate liability due to potential future inconsistent applications of the Uniform Comparative Fault Act and the Uniform Contribution Among Tortfeasors Act. Second, it objects to the proposed finding that the settlements are fair, reasonable and satisfy the requirements of CERCLA in light of the lack of disclosure of the financial terms or allocation of liability. The objections will be addressed in turn.

### A. The UCFA/UCATA Issue

■ A primary difference between the Uniform Comparative Fault Act ("UCFA") and the Uniform Contribution Among Tortfeasors Act ("UCATA") is the effect on non-settling parties of a release or agreement not to sue between settling parties. Under the UCFA,

> A release, covenant not to sue, or similar agreement entered into by a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides. However, the claim of the releasing person against other persons is reduced by the amount of the released person's *equitable share* of the obligation

> \* \* \* \* \* \*

UCFA at § 6. Thus under the UCFA, a non-settling party may offset its liability by a settling party's equitable share of liability. The effect of this provision is to impose upon the claimant who settles with a party—rather than upon a non-settling party—the risk that the settlement amount is disproportionately small.

■ The UCATA provides no such equitable protection. Under the UCATA,

> When a release or a covenant not to sue ... is given in good faith to one of two or more persons liable in tort for the same

9. Section 4(b) of the UCFA states, "Contribution is available to a person who enters into a settlement with a claimant only ... if the liability of the person against whom contribution is sought

has been extinguished." Because of this section, the settling parties (or the proponent parties as assignees of the settling parties) may not seek contribution from the non-settling parties.

injury or the same wrongful death: (a) It does not discharge any of the other tortfeasors from liability for the injury . . . unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; . . .

UCATA at § 4. Under this provision, a nonsettling party may offset its liability only by the amount paid (or stipulated). The risk that the settlement amount was disproportionately small is on the non-settling party.

█ In deference to the non-settling parties, the proposed order states that the UCFA, with its equitable protection, applies to determine the effect of the settlement agreements. However, the order also provides a large exception: the present and future claims of the United States as plaintiff. The United States contends that the UCATA should apply to determine the effect of the settlement agreements on the United States' claims. ADM disagrees. The proposed order expressly leaves open the question whether the UCFA, the UCATA, or some other rule of law will apply to the United States' claims.

Thus, as proposed, the order 1) applies the UCFA to all claims except the claims of the United States; 2) announces no rule of law for the United States' claims; and 3) applies the UCATA to no claims, although leaving open the possibility of UCATA application to the United States' claims.

The scenario ADM fears is as follows: 1) the amounts generated by the proponent parties and the settling parties will be insufficient to cover remediation costs at the site; 2) the United States will pursue ADM for the shortfall; 3) the Court will apply the UCATA to the United States' claims, allowing the United States to recover the full difference from ADM with no regard to equitable shares; and 4) ADM will be unable to obtain contribution from the settling parties—the relief contemplated by UCATA for parties required to pay more than their fair share [10]

—due to the proposed order's bar of claims against settling parties.

Upon close scrutiny, the Court finds that ADM's concerns do not warrant any change in the proposed order. ADM chose not to participate in the arbitration process and chose not to enter the FBRAG. It has every right to make such decisions. However, absent a strong showing of potential unfair prejudice to ADM, it should not be permitted to imperil the progress of those who chose to move this mass of litigation toward a conclusion.

ADM's objection is based upon the premise that the United States, at some point in the future, will initiate a government enforcement action, reach an inadequate settlement with the FBRAG/proponent parties and sue ADM for the balance. It offers no convincing reasoning why the United States, after years of litigation, would bargain unwisely with the FBRAG when it could hold all FBRAG parties jointly and severally liable just as it potentially could hold ADM jointly and severally liable. Neither ADM nor this Court can predict the future. However, this Court is not inclined to reject settlements reached at arm's length after months of negotiations, merely because of a longshot contingency that an unfortunate result might fall upon a non-participant in the settlement process.

This conclusion is bolstered by ADM's failure to show how, even under a worst-case scenario, that the result would conflict with Congress' judgment that non-settlors bear the risk of increased liability in a government enforcement action. Section 113(f)(2) of CERCLA, which essentially codifies UCATA for government enforcement action, states:

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the other by the amount of the settlement.

---

10. Section 1 of the UCATA provides a right of contribution for parties which, through joint and several liability, are required to pay more than their proportional share of liability.

42 U.S.C. § 9613(f)(2). Thus if, as ADM theorizes, the United States and the proponent parties would reach a future agreement for the latter's responsibility in covered matters, and such an agreement would fail to cover all costs at the site, the United States' subsequent pursuit of ADM for the entire balance would be consistent with the above quoted statutory provision.[11] While disregarding equitable shares might seem harsh, it is what Congress intended:

> Congress explicitly created a statutory framework that left nonsettlors at risk of bearing a disproportionate amount of liability.... Disproportionate liability, a technique which promotes early settlements and deters litigation for litigation's sake, is an integral part of the statutory plan.... Congress purposed that all who choose not to settle confront the same sticky wicket of which appellants complain.

*United States v. Cannons Engineering Corp.*, 899 F.2d 79, 91–92 (1st Cir.1990). In sum, ADM's concerns are misplaced because 1) they are based upon hypothetical situations not shown to be likely to occur, and 2) even if such scenarios were to be fulfilled, ADM fails to show that the result would be other than what Congress intended. ADM's objection based upon potential inconsistent application of the UCATA and the UCFA is thus without merit.[12]

## B. The Lack of Disclosure Issue

■ ADM objects to non-disclosure of the financial terms of the proposed settlements because the proponent parties and the settling parties seek a finding that the settlements are "fair, reasonable and satisfy the requirements of CERCLA." ADM argues that such a finding is impossible without full disclosure to the Court and to non-settlors of the settlement amounts, the proportion of liability assessed to each party, and the rationale for such determinations.

■ While disclosure of settlement amounts and allocations of liability is the norm, the Court is not convinced it is a *sine qua non* of a finding of fairness and reasonableness. Under the circumstances of this case, the process itself assures the conclusion that the settlements are fair, reasonable and satisfy CERCLA requirements. The proponent parties, standing at risk for collecting too little, have every incentive to ensure that each settling party pays its full share. Each settling party has every incentive to pay whatever is necessary to extricate itself from the case.[13]

The Sixth Circuit has recognized that "the legal posture of the parties [and] the nature of the negotiation process" are relevant in determining the fairness of a settlement. *United States v. Akzo Coatings of America, Inc., et al.*, 949 F.2d 1409, 1436 (6th Cir. 1991). Because of the application of the UCFA to these agreements, non-settlors as well as settlors are protected, as non-settlors cannot be tapped for contribution beyond their equitable share of liability.[14]

11. It is important to note that the proposed order does *not* bar ADM from pursuing contribution claims against the proponent parties. The bar only operates as to claims against the settling parties. Thus ADM's worst case scenario would not occur unless the United States initiates a government enforcement action and reaches a settlement with the proponent parties but not with ADM. This would result in the proponent parties obtaining contribution protection under Section 113(f)(2) of CERCLA, not under the proposed order. Under this scenario, then, ADM could be blocked completely from a right of contribution. But this is not the situation at hand and requires far more speculation than this Court is willing to undertake.

12. The Court can envision at least two more ways ADM can escape the hypothetically severe consequences of facing joint and several liability with no right of contribution in a future government action. First, ADM could settle with the United States in such an action and gain the same protection under Section 113(f)(2) that it projects the proponent parties as gaining. Second, ADM insists it has no liability at the site. *See* Objections to R & R, Docket No. 608, at 5–6. If such a claim proves meritorious, the United States could not recover from ADM in any circumstance.

13. Of course, the Settling Parties are still responsible for non-covered matters and for covered matters involving claims of the United States as plaintiff.

14. ADM again argues that it is jeopardized because of the undetermined choice of law for the United States' future claims as plaintiff. The Court already has addressed those concerns in Part A *supra.*

Additionally, the Court believes release of the information requested by ADM is likely to trigger further objections and create the need for a full-blown evidentiary hearing—precisely the litigation the settling parties are paying to avoid. The Northern District of Ohio, in *United States v. Laskin,* 1989 WL 140230 No. C84–2035Y, 1989 U.S.Dist. LEXIS (N.D.Ohio Feb. 27, 1989), rejected the request of a non-settling party in a similar CERCLA settlement proposal. The court reasoned that there was no statutory requirement for an evidentiary hearing, that most courts had found such a hearing unnecessary, and that the nonsettling parties could file summary judgment motions if they believed they were not liable. *Id.,* 1989 WL 140230, at 5–6, at * 14–16. Moreover, holding such a hearing "would expose the parties to the same risks, expense and uncertainties that a settlement is intended to avoid." *Id.,* 1989 WL 140230, at 5, at * 14.[15]

 For these reasons, the Court finds that the settlement agreements are fair, reasonable and meet the requirements of CERCLA without disclosure of the sums and allocations involved. For the same reasons, the Court does not believe an *in camera* review of the information is necessary. However, to preserve the integrity of the process and to ensure that appellate review is unhindered, the Court orders a sealed copy of the relevant documents to be submitted to the Court. Such documents shall include: 1) the arbitrator's report, including the Final Allocation Recommendation issued on October 17, 1994, 2) the individual factual nexus statements provided to each non-participant in the arbitration process on or about June 30, 1995, 3) amounts paid by all settling parties, and 4) amounts demanded and rejected by non-settling parties. These documents shall be accompanied by a certification by a representative of the proponent parties that they are a true and accurate copy of the above described information. The Court

shall not review the documents unless it is convinced at a later time of the need to do so, at which time it would notify the parties. The documents shall not be unsealed without order of this Court or a reviewing court.

In a related dispute, ADM has moved to compel discovery and to amend the Case Management Conference order. Both motions are aimed primarily at gaining access to the arbitrator's allocation formula. The Court discussed these pending motions with parties at the status conference on June 12, 1996, at which time the parties indicated the motions could become moot if the proponent parties elected to use the arbitrator as a witness at trial; in that case his report would be discoverable under the Federal Rules of Civil Procedure. The Court announced in a previous order (Docket No. 615) that it would defer ruling on the motions until the proponent parties negotiate further with non-settling parties and submit a status report to the Court on or before October 25, 1996.

## IV. CONCLUSION

The proponent parties and settling parties have worked creatively to narrow this massive litigation. As a result of the order this Court will enter, thirteen parties will be effectively dismissed from the suit, subject only to action on covered matters by the United States as plaintiff. Remaining will be the Fields Brook Remedial Action Group (functioning as a single party before the Court) and several non-settling parties. ADM has not set forth reasons sufficient to counter the advantages of simplification and cost reduction which the execution of the order will provide.

The Court adopts the recommendation of the magistrate judge and will enter an order approving the settlements, dismissing claims without prejudice and barring certain claims and actions against the settling parties. This grants the proponent parties' motion requesting such relief (Docket No. 561). The

---

**15.** ADM attempts to distinguish *Laskin* by pointing out that *Laskin* was a government enforcement case rather than a private party settlement. However, ADM fails to articulate why such a distinction should be dispositive to the issue. ADM also contends it is not seeking a full-blown hearing; it merely seeks the information on which the allocation decisions were based. However, there is little doubt that the next step in the process would be objections filed by ADM, to which the Court likely would need to hold a hearing, protracting the litigation significantly and unnecessarily.

order shall be issued contemporaneously with the issuance of this Memorandum Opinion.

The Court orders the Proponent Parties to provide a sealed copy of documents detailed on page 13 *supra* on or before July 12, 1996. Such submission shall be filed with the clerk of courts in compliance with Local Rule 1:2.6.

IT IS SO ORDERED.